Travis S. MIDGYETT, Appellant,

v.

STATE of Missouri, Respondent.

No. WD 74731.

Missouri Court of Appeals,
Western District.

Dec. 4, 2012.

Motion for Rehearing and/or Transfer
to Supreme Court Denied Jan.
29, 2013.

Application for Transfer Denied
March 19, 2013.

Benjamin J. Gray, Kirksville, MO, for Appellant.

Chris Koster, Attorney General, Jennifer A. Rodewald, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division IV: JAMES EDWARD WELSH, Chief Judge, MARK D. PFEIFFER, Judge, and DEBORAH DANIELS, Special Judge.

MARK D. PFEIFFER, Judge.

Travis Midgyett ("Midgyett") appeals the Circuit Court of Boone County's ("motion court's") denial of his motion for post-conviction relief pursuant to Rule 29.15. Midgyett was convicted, after a jury trial, of attempted robbery in the first degree and of murder in the second degree. Midgyett argues that the motion court erred in finding that his trial counsel ("Counsel") was not constitutionally ineffective for failing to present evidence Midgyett claims would have changed the outcome of the case. We affirm.

## Factual and Procedural Background

Carlos Kelly, a drug dealer, was murdered in his home during the early morning hours of March 29, 2006. On the previous evening, Kelly had been partying and doing drugs with Teisha Moody, who sold drugs with Kelly, and Angela Hawkins, Moody's cousin. At around 2:00 a.m. on March 29, as the party was winding down, Damorea Salisbury, who lived with Kelly, became hungry and asked Hawkins to take him to a nearby McDonald's. Hawkins agreed. Moody decided to go upstairs to take a shower, and Kelly was asleep on the couch in the living room. When Moody finished her shower, she went downstairs to lock the front door to Kelly's apartment, which Salisbury and Hawkins had left unlocked. Before Moody locked the door, she looked out of the blinds that covered a window in the door. She saw a pair of eyes looking back at her. Immediately, the door was pushed open, and three men barged into the apartment.

The men were looking for money and drugs. They awakened Kelly and asked him where the drugs could be found. One of the men went outside and returned with a piece of wood. He hit Kelly in the head with the piece of wood, knocking Kelly unconscious. At around this time, Hawkins and Salisbury returned to the apartment; they were also questioned about the location of the drugs, and Salisbury was stabbed in the leg. The men ransacked the house, looking for drugs and money, but were not finding anything. The men tried to revive Kelly by throwing cold water on him to question him further. When Kelly did not respond, the men figured that he was dead. They eventually left the apartment.

Moody then went upstairs to collect her things, including about $800 worth of drugs that the intruders had not found. Moody, Hawkins, and Salisbury then left the apartment and called the police from a nearby gas station to notify them of Kelly's murder.

On March 30, 2006, Midgyett and Rodney Cunningham were arrested for Kelly's murder. Both men denied having anything to do with the crime. In March of 2007, Midgyett was tried for Kelly's murder and for the attempted robbery. Moody and Hawkins testified against Midgyett, both claiming that he was one of the three men who broke into Kelly's apartment and killed him. Midgyett presented the testimonies of two of his cousins, with whom he was living at the time, and of his girlfriend, all of whom stated that Midgyett was home for at least part of the night and the early morning hours during which Kelly was murdered. Midgyett also presented evidence from a Sprint engineer that his cell phone, which made or received calls throughout the relevant time period of the murder, was most likely not anywhere near Kelly's apartment. The jury was unable to agree on a verdict, and the court declared a mistrial.

Midgyett was retried in November of 2007. Midgyett was once again represented by Counsel, who planned to present the same evidence as he had at Midgyett's first trial. The State also put on much of the same evidence, with one important addition: in the intervening time period between Midgyett's first and second trials, Cunningham had been found guilty of Kelly's murder. Although Cunningham, like Midgyett, had always maintained that he had nothing to do with the murder, after his guilty verdict, he agreed to testify against Midgyett in exchange for the State's supporting Cunningham's counsel's request for a significant reduction in his sentence, which was to be imposed *after* Midgyett's second trial. Counsel knew that Cunningham would testify against Midgyett, but he believed that Cunningham's testimony would be impeachable. In his opening statement, Counsel told the jury that he would present electronic evidence from a Sprint cellular phone expert showing that Midgyett's Sprint cell phone (and thus, presumably, Midgyett) could not have been at Kelly's apartment on the night of his murder. After Cunningham's testimony, however, Counsel decided not to present the cell phone evidence. He also did not present Midgyett's girlfriend or one of Midgyett's two cousins, and he did not present Midgyett's mother. The jury found Midgyett guilty of both the murder and the attempted robbery. Midgyett's convictions were affirmed on appeal. *State v. Midgyett*, 297 S.W.3d 932 (Mo.App. W.D.2009).

Midgyett filed a motion for post-conviction relief on December 31, 2009. Midgyett alleged that Counsel was constitutionally ineffective in abandoning Midgyett's alibi defense in that Counsel did not call to the stand Midgyett's girl-

friend, Midgyett's cousin, the Sprint engineer, and Midgyett's mother, who would have testified that Midgyett was never without his cell phone. Midgyett claimed that Counsel's failure to present this evidence was compounded by his promise to the jury, during opening statements, that this evidence would be forthcoming. Midgyett also claimed that Counsel was ineffective for failing to call witnesses Damorea Salisbury and Amy Garrison at his second trial. Finally, Midgyett claimed that Counsel ineffectively cross-examined Moody at his second trial.[1] The motion court denied all of Midgyett's claims.

Midgyett alleges three points of error on appeal. The first two, which we consider together, are that the motion court erred when it found that Counsel was not constitutionally ineffective for failing to call to the stand witness Russell Chrisman, the Sprint engineer, especially after having promised the jury during opening statement that "experts from Sprint" would testify. Midgyett's third point is that the motion court erred by failing to consider the aggregate effect of all of Counsel's alleged errors, which, if considered together, would have shown Counsel to have been constitutionally ineffective.

## Standard of Review

We review the motion court's findings and conclusions on a Rule 29.15 motion only to determine whether they were clearly erroneous. *Johnson v. State*, 333 S.W.3d 459, 463 (Mo. banc 2011); Rule 29.15(k). "The motion court's findings and conclusions are clearly erroneous only if, after reviewing the entire record, the appellate court is left with the definite and firm impression that a mistake has been

made." *Krider v. State*, 44 S.W.3d 850, 856 (Mo.App. W.D.2001).

When a motion alleges ineffective assistance of counsel, the movant "must show that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney and that movant was thereby prejudiced." *Johnson*, 333 S.W.3d at 463, (internal quotations and citation omitted); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To demonstrate prejudice, a movant must show that, but for counsel's poor performance, there is a reasonable probability that the outcome of the court proceeding would have been different." *Johnson*, 333 S.W.3d at 463 (internal quotation omitted). An appellate court "presumes that counsel acted professionally in making decisions and that any challenged action was part of counsel's sound trial strategy." *Id.* It is Midgyett's burden to overcome this presumption. *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996).

## Failure to Present Witness Chrisman

Midgyett's first two points on appeal involve Counsel's failure to call the Sprint engineer, Chrisman, to the witness stand after his opening statement included Counsel's promise that the jury would hear expert cellular phone testimony from Sprint representatives. Generally, to succeed on an ineffectiveness claim based upon counsel's failure to call a witness, the movant must show: (1) that trial counsel knew or should have known of the witness's existence; (2) that the witness could be located through reasonable investigation; (3) that the witness would testify; and (4) that the witness's testimony would

---

1. Midgyett made other claims of error in his Rule 29.15 motion but has abandoned those arguments on appeal, and thus, we need not and do not address those arguments in our ruling today.

have produced a viable defense. *Worthington v. State*, 166 S.W.3d 566, 577 (Mo. banc 2005). Counsel's decision not to call a witness is presumed to be a matter of trial strategy and a movant must clearly show otherwise before we will find ineffective assistance. *Hutchison v. State*, 150 S.W.3d 292, 304 (Mo. banc 2004).

■ Complicating matters, however, is the fact that Counsel promised the Sprint expert witness testimony in his opening statement. Counsel called this "electronic evidence" one of the "building blocks" of Midgyett's defense. When a defense attorney promises during opening statements that the attorney will present certain evidence and then does not present that evidence, the attorney opens himself up to criticism of the effectiveness—or ineffectiveness—of his representation of the defendant. *See Blankenship v. State*, 23 S.W.3d 848, 851 (Mo.App. E.D.2000). That is not the end of the inquiry, however. Instead, when determining whether an unfulfilled evidentiary promise made by defense counsel could contribute to a finding of counsel's ineffectiveness, courts look to whether "unforeseeable events" occurring during the trial would justify counsel's

change in trial strategy. *Francis v. State*, 183 S.W.3d 288, 303 (Mo.App. W.D.2005).

■ At the motion hearing, Counsel testified that, although he knew that Cunningham would testify at Midgyett's second criminal trial, he did not realize until after Cunningham's testimony how credible Cunningham's testimony would be. The question, then, is whether a defense counsel's estimation of a key witness's credibility can constitute an unforeseeable event that could justify the defense counsel's change in trial strategy. Counsel testified that Cunningham came across as being "brutally honest," meaning that, in Counsel's estimation, the jury not only found Cunningham credible when he testified that he was involved in Kelly's murder, but that the jury found Cunningham to be a really bad character.[2]

Counsel testified that, after Cunningham's testimony, Counsel believed it highly inadvisable to connect Midgyett to Cunningham any further, and that the cell phone evidence showed several calls between Cunningham's and Midgyett's cell phones during the time period in which Kelly's murder took place.[3] Not only

2. Given the jury instructions in the second trial in which the jury was directed to find Midgyett guilty of attempted robbery in the first degree whether Midgyett personally committed the criminal conduct himself *or* if he "acted together with or aided Rodney Cunningham ... in committing the offense" (Instruction No. 6), any connection to Cunningham on the evening of the crimes was fraught with the danger that a jury would conclude that Midgyett had aided, promoted, or otherwise furthered the commission of the crimes Cunningham was admitting to in his testimony, which, of course, would lead to Midgyett's conviction.

3. We also note that the Sprint engineer's testimony would not have unqualifiedly supported Midgyett's defense. *See Worthington v. State*, 166 S.W.3d 566, 577 (Mo. banc 2005) ("If a

potential witness's testimony would not unqualifiedly support a defendant, the failure to call such witness does not constitute ineffective assistance." (internal quotation omitted)). Although the cell phone evidence certainly could have shown that it was highly unlikely that Midgyett's *cell phone* was not at the scene of Kelly's murder during the relevant time period, there was no testimony in either of Midgyett's two trials that placed the cell phone in Midgyett's possession during that time. Although Midgyett's mother's testimony at his first criminal trial was that Midgyett was normally reachable on his cell phone, and that Midgyett's mother had, in fact, reached him on his cell phone several times on the day preceding the murder, Midgyett's mother did not testify that she had called Midgyett in the several hours previous to or following Kelly's murder. No other witness testified that Midgyett had his cell phone in

would the Sprint engineer's testimony show calls between the two phones during the relevant time period, but also that the calls from both Cunningham's and Midgyett's phones were originating from the same cell tower, meaning that they were in fairly close proximity to one another. Counsel testified at the motion hearing that this further connection between Midgyett and Cunningham, whom Counsel felt that the jury believed to have been involved in Kelly's murder during an attempted robbery, was too risky to present to the jury, even though he had initially planned on presenting the evidence. Specifically, Counsel stated, "As I recall, it was the calls—it was some of the call traffic between those two phones and the tower evidence with respect to that traffic." Shortly thereafter, Counsel continued, "We had discussions ... that at that time going down a road where we have a lot of calls between Cunningham and Midgyett and maybe looking at further rebuttal evidence on that stuff would have hurt us was our thought." In light of the fact that Midgyett was charged alternatively— that *either* Midgyett committed the charged offenses himself *or* Midgyett *acted together with or aided Cunningham* in committing the offenses—we conclude that Counsel's assessment of how Cunningham's testimony was received by the jury, coupled with the fact that the cell phone evidence intimately connected Cunningham to Midgyett, could fairly justify his

change of trial strategy as to the presentation of the cell phone evidence.

Moreover, at the motion hearing, Counsel made clear that his failure to call the Sprint engineer to testify about the cell phone records was not due to any inadvertence but was, indeed, a matter of trial strategy. *See Gennetten v. State*, 96 S.W.3d 143, 151 (Mo.App. W.D.2003) (analyzing whether counsel's failure to call a particular witness, which the court had concluded was error, was due to inadvertence or was, rather, a matter of trial strategy). Counsel testified that he knew it was a "substantial decision to let go of" the Sprint engineer's testimony. Counsel stated that he had to "make an evaluation based upon how we thought Cunningham testified and how that testimony came across and how the other evidence was hurting us; whether we wanted to go down the road, some of the things a [sic] cell phone evidence exposed us to." Counsel further testified that "it was clearly discussed in that letting it go was a big deal. And, I mean, I believe that was discussed with [Midgyett] also." Thus, Counsel's decision was clearly considered, strategic, and involved input from Counsel's client—Midgyett.

■■■ Once an attorney's action is found to have been a matter of trial strategy, the movant must overcome the presumption that the attorney's trial strategy

his possession at the time of Kelly's murder, and Midgyett himself did not testify (and notably, Midgyett does not complain of Counsel's strategy not to call Midgyett as a witness in his defense). Although Midgyett argues that the presence of a cell phone "permits" the reasonable inference that the cell phone owner is present with the phone, such an inference is certainly not *required*. To make this inference, even if it would otherwise be permissible, would be to make an inference contrary to the jury's verdict, which neither a motion court nor the appellate court review-

ing the motion court's order may do. Likewise, as we discuss in our ruling today, the cell phone evidence connected Midgyett to Cunningham, both in the form of communication with each other at or near the time of the murder and in the same "tower location" at or near the time of the murder. If, as Counsel surmised, Cunningham was believed by the jury, these cell phone "connections" to Cunningham would have severely diminished any alibi defense by Midgyett and may have actually had the opposite effect of helping the State prove its case against Midgyett.

was sound. To do this, the evidence must establish that counsel's actions "fell outside the wide range of professional competent assistance." *Borst v. State*, 337 S.W.3d 95, 102 (Mo.App. W.D.2011) (internal quotation omitted). "Movant cannot rely on the distorting effects of hindsight, and we must deferentially review the situation from the attorney's perspective at the time of the representation." *Id.* (internal quotation omitted).

The motion court found that Cunningham's testimony "put a wrench in the entire alibi defense" and concluded that Counsel's resulting decision not to call the Sprint engineer was strategically sound and was justified. Based upon Counsel's considered and reasonable strategy with regard to this witness that we have identified previously, we do not find the motion court's determination to be clearly erroneous. Accordingly, Midgyett's first two points are denied.

### Cumulative Effect of Trial Errors

Midgyett's third point on appeal is that the motion court erred by failing to consider the aggregate effect of Counsel's many claimed errors. Midgyett argues that the aggregate effect of Counsel's errors impacted the fairness and outcome of Midgyett's second criminal trial and undermined confidence in the outcome of his second trial. In his Rule 29.15 motion, Midgyett alleged that Counsel was ineffective in: (1) failing to call Damorea Salisbury as a witness; (2) failing to call LaTonya Turner; (3) failing to call Angel Midgyett; (4) failing to call Darlene Midgyett; (5) failing to call Chrisman, the Sprint engineer; (6) failing to locate and speak to Amy Garrison; and (7) failing to sufficiently cross-examine Moody.

Midgyett argues that many small errors, which, if considered separately, may not be prejudicial enough to require reversal, may require reversal if they would serve to deprive the Rule 29.15 movant of a meaningful defense when their cumulative effect is considered. Midgyett cites only to cases from outside of Missouri to support this argument. Ultimately, we need not consider any cumulative prejudicial effect of Counsel's alleged trial errors because, like the motion court, we consider all or nearly all of the alleged errors not to be errors at all, in that they were all either matters of trial strategy or were actions that did not prejudice Midgyett's defense. We will consider each in turn.

**Counsel's failure to call various witnesses:** As stated above, to establish that Counsel was ineffective for failing to call witnesses, Midgyett would have to show that each of those witnesses was: (1) known to Counsel or should have been known to Counsel; (2) able to be located through reasonable investigation; and (3) able to testify and produce a viable defense for Midgyett. *Worthington*, 166 S.W.3d at 577.

■ **1. Damorea Salisbury:** Salisbury lived with Kelly, was present during much of the robbery on the night of Kelly's murder, and may have witnessed the murder. Salisbury knew both Cunningham and Midgyett, and originally told police that both Cunningham and Midgyett were involved. Later, however, Salisbury recanted his original statement to police, stating that he felt pressure from the police to implicate Cunningham and Midgyett for Kelly's murder. Salisbury stated that the police "had the wrong guys" in Cunningham and Midgyett. Counsel did not call Salisbury at Midgyett's first trial because he was not sure whether Salisbury's testimony would help or hurt Midgyett's case since he originally implicated Midgyett.

Furthermore, on June 1, 2007, between Midgyett's first and second trials, Salisbury was shot and badly wounded. Salisbury was still in the hospital at the time of Midgyett's second trial. In fact, Salisbury testified that he was in the hospital for an entire year. Salisbury also testified that his memory of the events on the night of Kelly's murder had been affected by his injury. Because Salisbury was in the hospital and recuperating from a serious injury (that may have adversely impacted his memory) at the time of Midgyett's second trial, Midgyett has not shown that Salisbury would have even been available to testify on Midgyett's behalf or to produce a viable defense for Midgyett. It was not error for Counsel to have not called Salisbury to testify at Midgyett's second trial.

**2. LaTonya Turner:** Turner was Midgyett's girlfriend at the time of Kelly's murder. She and Midgyett were both living with Midgyett's cousin, Natalie Midgyett, and Turner was with Midgyett and Cunningham in Natalie Midgyett's apartment at the time of their arrest on the day following Kelly's murder. Turner testified at Midgyett's first trial. Although Midgyett argues that Turner contributed to his alibi defense, Turner never actually testified that she was with Midgyett at the time of Kelly's murder. Turner was called by the State, and was questioned about her apparent statement to police shortly after the murder that she had not seen Midgyett for a couple of days prior to the murder. On cross-examination, Turner answered affirmatively that she had "seen [Midgyett] between the time that Carlos Kelly was murdered on March 29th of 2006, and when [Midgyett] was arrested on March 30th of 2006." This testimony was as close as Turner's testimony ever was to providing an alibi for Midgyett. Turner did not testify at Midgyett's evidentiary hearing on the Rule

29.15 motion; but in his motion, Midgyett claims that Turner's testimony, had she been called, would have been substantially the same as it was for his first trial. Because Turner's testimony did not provide an alibi for Midgyett at his first trial (and her testimony would have served as another connection between Midgyett and Cunningham), we conclude that Turner's testimony would not have aided him at his second trial and may have done more harm than any good. It was, therefore, not error for Counsel not to have called Turner at Midgyett's second trial.

**3. Angel Midgyett:** Angel Midgyett ("Angel") testified at Midgyett's first trial. Angel was Midgyett's cousin, and was Natalie Midgyett's ("Natalie") sister. She lived in the apartment with Natalie, Midgyett, and Turner at the time of Kelly's murder. Like Turner, Angel did not testify at Midgyett's evidentiary hearing. Unlike Turner, Angel did testify at Midgyett's first trial that she was with Midgyett the entire time during the evening of the 28th and the morning of the 29th of March 2006, when Kelly's murder occurred. She also testified that it was not unusual for Midgyett to be awake late into the night and to be talking on his cell phone at all hours.

On the other hand, Angel did not provide an alibi to Midgyett immediately following his arrest. She had a warrant out for her arrest and did not want to talk to police for fear of being arrested. During Midgyett's first trial, the State berated Angel for her failure to come forward, asking, "So, the fact that you have a warrant and may have to answer for a charge that's against you is more important to you than clearing your cousin of a murder that he couldn't have committed because he was with you? Is that what we're hearing?" Angel answered, "I guess, if that's how you take it." Although Angel's testimony does not appear on the cold record

to have been strong, it would have supported his alibi defense, assuming that she would have testified at the second trial consistently with her testimony from the first trial. Therefore, we will consider the prejudicial effect of Counsel's failure to call Angel at Midgyett's second trial after we have analyzed all of Counsel's alleged errors.

■ **4. Darlene Midgyett:** Darlene Midgyett ("Darlene") is Midgyett's mother. She did not testify at Movant's evidentiary hearing. Darlene testified at Midgyett's first trial that Midgyett could always be reached on his cell phone and that she spoke with Midgyett on his cell phone several times each day. Darlene testified that she spoke with Midgyett several times on March 29, 2006. None of Darlene's conversations with Midgyett, however, occurred during the late-night to early-morning hours of March 29–March 30, when Kelly was murdered. Darlene's testimony, therefore, does not put Midgyett's cell phone in his hands at the time of Kelly's murder.

Furthermore, Darlene was removed from the courtroom and cited with contempt of court early in Midgyett's second trial for calling a witness a liar in open court. After her outburst, which occurred in the jury's presence, it is likely that Darlene's testimony would not have been well received. It was thus not error for Counsel to decide not to call Darlene as a witness at Midgyett's second trial.

**5. Chrisman, Sprint Engineer:** As stated above, Counsel's failure to call Chrisman was a matter of trial strategy and was not error.

■ **6. Amy Garrison:** Teisha Moody ("Moody") testified at both of Midgyett's trials that she identified Midgyett's eyes from a picture in a newspaper article that she had seen in the possession of a fellow jail inmate, Amy Garrison ("Garrison"). Midgyett argues that Counsel

should have located Garrison and asked her whether Moody's story about acquiring the newspaper article from Garrison were true. At Midgyett's evidentiary hearing, he did not present any evidence as to what Garrison would have said or how Garrison's testimony would have affected his trial other than perhaps slightly further impeaching Moody's testimony. Midgyett does not allege that Garrison could have in any fashion provided information that would have provided a viable defense for him at trial. Therefore, he has not shown that Counsel erred in failing to investigate or call Garrison. *See Gennetten,* 96 S.W.3d at 153 (finding counsel ineffective for failing to investigate and call an expert witness later shown to have been able, not only to impeach another witness's testimony, *but to contradict it substantively,* which would have provided a viable defense to Gennetten).

■ **7. Teisha Moody:** At Midgyett's first trial, Counsel elicited from Moody that the porch light was not on when she looked out the front door and saw what she later identified as Midgyett's eyes. Counsel also elicited that, after Kelly's murder, Moody went upstairs in Kelly's apartment to retrieve drugs that the robbers did not find during the robbery before she left with Salisbury and Hawkins to call the police. Counsel did not elicit similar testimony from Moody at Midgyett's second trial. Midgyett claims that this error on Counsel's part contributed to his ineffectiveness.

Moody testified that it was dark outside when she looked through two slats in the blinds and saw a pair of eyes. She also testified that she just saw the eyes for a second and did not even have time to lock the door before the robbers burst through the door and commenced with the robbery. The fact that the porch light was not on adds little to this part of Moody's testimony.

Moody also testified that she had been doing drugs for hours on the night of Kelly's murder. She testified that she had done drugs the night before Kelly's murder, that she sold drugs with Kelly, that she did not identify herself immediately to police because she was afraid of being arrested, and that she was incarcerated at the time of Midgyett's trials on drug trafficking convictions. After Moody's testimony, the jury already knew that Moody was a heavy drug user and a drug dealer. Testimony that she put off calling for help for her dead or dying boyfriend while she went upstairs to gather her things and the drugs that the robbers did not find would possibly further impeach Moody, but it is highly unlikely that it would make any difference in the jury's assessment of her credibility and her identification of Midgyett when considering her testimony as a whole. Moreover, as the motion court noted in its order, "[a] simple failure to impeach a witness does not warrant post-conviction relief. *Gray v. State*, 139 S.W.3d 617, 622 (Mo.App. W.D.2004). Movant must show that had the witness been impeached, it would have provided him with a defense or changed the outcome of the trial. *Id.*" In this case, the motion court found that the testimony that Counsel failed to elicit from Moody would have neither provided a viable defense nor changed the outcome of Midgyett's second trial. We agree.

**Prejudicial Effect of Error:** The only one of Counsel's alleged trial errors that is even arguably a legitimate error would be Counsel's failure to call Angel to support Midgyett's alibi defense. And, standing by itself, Counsel's failure to produce Angel, whose testimony was not strong and was mostly duplicative of her sister's testimony, was not reasonably likely to have affected the outcome of Midgyett's second criminal trial. The other alleged errors were not errors at all, but rather matters of sound trial strategy, or

matters of no evidentiary consequence. "Numerous non-errors cannot add up to error." *State v. Gray*, 887 S.W.2d 369, 390 (Mo. banc 1994) (internal quotation omitted). There was simply no cumulative or aggregate effect of errors for the motion court to consider and we find the motion court's analysis to comport with the *Strickland* requirements. Accordingly, Midgyett's third point on appeal is denied.

### Conclusion

It was not clearly erroneous for the motion court to conclude that Counsel was not constitutionally ineffective in his representation of Midgyett at his second trial. Thus, the judgment of the motion court is affirmed.

JAMES EDWARD WELSH, Chief Judge, and DEBORAH DANIELS, Special Judge, concur.